Julian Brew (State Bar No. 150615)
Cypress LLP
11111 Santa Monica Boulevard, Suite 500
Los Angeles, CA 90025
Telephone: (424) 317-6220
Facsimile: (424) 750-5100
julian@cypressllp.com

Attorneys for Plaintiffs
SWEETWATER MALIBU CA LLC
and TEODORO NGUEMA OBIANG
MANGUE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SWEETWATER MALIBU CA, LLC, a California limited liability company; and TEODORO NGUEMA OBIANG MANGUE, an individual,

　　　　　Plaintiff,

　　vs.

SAM HAKIM, an individual; AITAN SEGAL, an individual; and BERKSHIRE HATHAWAY HOMESERVICES, CALIFORNIA INC., a California corporation.

　　　　　Defendants.

Case No. 2:20-cv-08945

**COMPLAINT FOR:**
**(1) CONSPIRACY TO VIOLATE FEDERAL COURT ORDER;**
**(2) VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT;**
**(3) VIOLATION OF CALIFORNIA CARTWRIGHT ACT;**
**(4) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**
**(5) CONSPIRACY TO DEFRAUD; AND**
**(6) BREACH OF DUTIES OF HONESTY AND FAIR DEALING**

COMPLAINT

Plaintiffs Teodoro Nguema Obiang Mangue ("Nguema") and Sweetwater Malibu CA, LLC, formerly known as Sweetwater Malibu, LLC ("Sweetwater") (collectively, "Plaintiffs"), for their Complaint against defendants Berkshire Hathaway Homeservices California Inc. ("BHHC"), Aitan Segal ("Segal") and Sam Hakim ("Hakim") (collectively, "Defendants"), allege:

## JURISDICTION

1.      The Court has original subject matter jurisdiction over this action because it alleges claims under the Clayton Act, 15 U.S.C. § 15, based on Plaintiffs' claim for damages against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and ancillary jurisdiction over the state law claims arising out of the same transactions, conduct and occurrences.

2.      This action also relates to and alleges violations of  a Stipulated Settlement Agreement and Order (the "Settlement Agreement") resolving a civil asset forfeiture action pending in this Court, entitled *United States of America v. One Michael Jackson Signed Thriller Jacket, et al.* (Case No. CV 13-9169-GW-SS) (the "Action").  That Action sought, among other things, civil forfeiture of an estate that was owned by Plaintiffs and located at 3620 Sweetwater Mesa Drive in Malibu, California (the "Property") that is at issue in this lawsuit.

3.      The Court entered an Order on October 13, 2014 (the "Order") adopting the Settlement Agreement which was attached, ordering that the Property "be liquidated and distributed in accordance with the Settlement Agreement," and ordering all the parties to "cooperate with the other(s) to perform the acts required by the Settlement Agreement, and refrain from taking any action that is inconsistent with the Settlement Agreement."  The Order stayed, but did not dismiss, the Action and further specifically provided that the "Court retains jurisdiction in this matter to take additional action and enter further orders as necessary to implement and enforce this Order and the Settlement Agreement."

4.     Accordingly, this Court also has ancillary jurisdiction over the claims in this action, because they include claims alleging a conspiracy among Defendants and others to violate the Order and Plaintiffs seek a judgment that is necessary to implement and enforce the Order, including by recovering additional proceeds that were diverted by Defendants from the uses ordered by the Court.  *See Kokkonen v. Guardian Life Ins. Co.,* 114 S. Ct. 1673 (1994).

5.     The Court also has ancillary jurisdiction over the claims in this action because they arise out of and relate to the same transactions and occurrences alleged in another action pending before this Court entitled *Sweetwater Malibu CA LLC et al. v. Umansky, et al.* (Case No. Case No. CV 19-1848-GW-SSx), including claims that Defendants aided, abetted and conspired with the defendants in that action to commit the wrongdoing alleged therein.

6.     This Court has personal jurisdiction over Defendants because each of them resides in and transacts business in this District and engaged in anticompetitive acts and other wrongful conduct in this District and that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the business or property of persons and entities residing in, located in, or doing business in this District.  Defendants also conduct and have conducted business throughout the United States, including in this District, and purposefully availed themselves of the laws of the United States.

7.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. §§ 1391(b), (c), and (d), because a substantial part of the events and actions giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside and/or do business in this District.

## INTRODUCTION

8.    This case involves a conspiracy among prospective buyers of Plaintiffs' valuable Malibu estate and a celebrity real estate agent, Mauricio Umansky, and his brokerage firm The Agency, who purportedly acted as Plaintiffs' agents in the sale, but were also representing all but one bidder for the Property and was actively and fraudulently acting against Plaintiffs' interests as alleged herein.  Defendants also conspired with Umansky to use his position as Plaintiffs' listing agent and fiduciary to depress the price, resulting in a sale to one of the buyers for tens of millions below the price that should have been paid for the property, and less than the price that Defendants were willing to pay and told Umansky they would pay.

9.    Plaintiffs have already sued Umansky for breaches of fiduciary duties, fraud and other wrongdoing arising out of his role in the scheme, which included brazen violations of the agent's contractual, statutory and fiduciary duties, including fiduciary duties of the utmost care, loyalty, honesty, and to work diligently to maximize the sale price, and a duty not to engage in self-dealing or earn secret profits from the representation.  Plaintiffs now bring this action against Defendants for their role in the scheme and conspiracy.

10.    This conspiracy could not have succeeded without the active and knowing assistance of Defendants.  Defendants conspired with other buyers directly and through Umansky to unlawfully refrain from competing for the Property, in violation of the Order and federal and state antitrust laws.  Defendants actively aided and abetted Umansky's breaches of fiduciary duties to his clients and conspired with him to defraud Plaintiffs.  This conspiracy also included multiple violations of the Order governing the sale of the Property and use of proceeds, and agreements to pay Umansky secret compensation for his help in depressing the price.

11.    As provided in the Settlement Agreement and Order, the full market value for the Property was supposed to have been used to benefit the people of Equatorial Guinea.  Instead, as a result of the conspiracy and other wrongful conduct

alleged herein, the buyer was able to purchase the property for $32.5 million, well below its market price, and then sell it less than a year later for almost $70 million, resulting in massive profits that he shared with Umansky and his other wealthy associates, thousands of miles and worlds away from Equatorial Guinea.

## THE PARTIES

12.    Plaintiff Sweetwater Malibu CA, LLC ("Sweetwater"), formerly known as Sweetwater Malibu, LLC, is and at all relevant times was a California limited liability company.

13.    Plaintiff Nguema is and at all relevant times was a resident of the Republic of Equatorial Guinea and the sole owner and managing member of Sweetwater.  Nguema also currently is the Vice President of Equatorial Guinea.

14.    On information and belief, Defendant Sam Hakim ("Hakim") is and at all relevant times was a resident of the State of California, and an experienced real estate developer.

15.    On information and belief, Defendant Aitan Segal ("Segal") is and at all relevant times was resident of the State of California, and a licensed real estate agent and/or real estate broker in the State of California.

16.    On information and belief, Defendant Berkshire Hathaway Homeservices California Inc. ("BHHC") is a real estate brokerage firm licensed in the State of California, and Segal is and at all relevant times was an employee and agent of BHHC, acting on behalf of BHHC, and BHHC is vicariously liable for his acts, omissions, and resulting losses alleged herein.

17.    On information and belief, each defendant was the agent, employee, principal, co-conspirator and/or aider and abettor of each other defendant and the other third parties as alleged herein, or aided and abetted their wrongdoing, acting within the course and scope of such agency or employment, or in furtherance of such conspiracy, such that each is jointly and severally liable for all damages, secret profits and other relief sought herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

18.     On December 12, 2013, the United States filed the Action, seeking among other things civil forfeiture of the Property.  On October 9, 2014, the parties entered into the Settlement Agreement, resolving those claims by agreeing to a sale of the Property with the proceeds to be used as specified therein, including to benefit the people of Equatorial Guinea.

19.     The Settlement Agreement was filed in the Action, and the Court entered an Order on October 13, 2014 (the "Order"), providing that the Property "shall be liquidated and distributed in accordance with the Settlement Agreement." The Order also required each party to "cooperate with the other(s) to perform the acts required by the Settlement Agreement, and [to] refrain from taking any action that is inconsistent with the Settlement Agreement."

20.     In the Order, this Court also expressly "retain[ed] jurisdiction in this matter to take additional actions and enter further orders as necessary to implement and enforce this Order and the Settlement Agreement."  A copy of the Settlement Agreement was attached and became part of the public record in the Action.

21.     The Settlement Agreement provided for Plaintiffs to hire a licensed real estate agent approved by DOJ to sell the Property, and that the contract with the agent "will require that the Licensed Agent review and comply with the provisions of this Settlement Agreement."

22.     In addition to fiduciary and contractual duties to Plaintiffs as sellers, the listing agent was required "to work cooperatively with the United States in the conduct of its activities, including reporting regularly to the United States and providing all requested information promptly to the United States relating to the [property] and its sale."

23.     The Settlement Agreement and Order required that the Property " be sold in accordance with the terms of this Settlement Agreement for fair-market-value ("FMV"), as that term is defined pursuant to California Code of Civil

Procedure Section 1263.320, unless a sale at an alternative price is approved in writing by both counsel for the United States and counsel for Nguema, in arm's length transactions."

24.     Section 1263.320 defines fair market value as:  "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

25.     The Settlement Agreement provided that Plaintiffs would sell the Property and that the proceeds reflecting fair market value would be held in an escrow account to be used for certain specified purposes, including reimbursement of expenses associated with the sale, and a payment to the United States, with the remainder used for the benefit of the people of Equatorial Guinea, as determined by a committee consisting of a representative of Nguema, a representative of the DOJ and a third person selected by the other two members.

26.     Plaintiffs continued to have a significant interest in and role in deciding the specific ways in which the proceeds were used, as well as in recovering the greatest amount for the benefit of the people of Equatorial Guinea.  No charity has yet been selected to receive either proceeds already obtained or any proceeds subsequently recovered.  This Court has scheduled a hearing to address issues that have arisen concerning disposition of the proceeds.

27.     Mauricio Umansky and his brokerage firm The Agency are high-end licensed real estate agents and brokers who hold themselves out as the "preeminent player[s] in the luxury real estate market, representing many of the country's most visible and high-end properties."  They tout to prospective clients and the broader public their "knowledge, spheres of influence, contacts and expertise, ensuring our

clients better representation and a true competitive edge."  Umansky also promotes himself "as the #3 top-producing real estate agent in the U.S. and #1 in California," having sold the most homes in the country above $20 million, and his representation of celebrities and wealthy individuals.  He also is married to one of the "Beverly Hills Housewives," and has frequent appearances on the show, adding to his carefully cultivated reputation.

28.     In June 2015, pursuant to the Settlement Agreement and Order, Plaintiffs entered into an exclusive listing agreement (the "Listing Agreement") with Umansky to sell the Property, which provided for a commission of six percent (6%) of the sale proceeds, which is higher than the typical amount of five percent (5%) or less.  Plaintiffs and DOJ agreed to this higher amount based on Umansky's reputation and ability to get the best possible price for the Property.

29.     The Listing Agreement provided that the Property would be listed at a price of $32 million but, as also provided in the Settlement Agreement, and Order, the Property was required to be sold at its actual true market value.  The Listing Agreement obligated Umansky to comply with the Settlement Agreement, and provided that the "Settlement Agreement provisions will prevail in the event any of them conflict with the terms in this Agreement."

30.     As Umansky and Defendants were aware, under California law, as the listing agent, Umansky owed Plaintiffs fiduciary duties, including duties to work diligently to obtain the highest price for the Property, to not enter into secret arrangements to earn compensation from the sale or that would create conflicting interests from Plaintiffs as his clients, and to not disclose to buyers the lowest price Plaintiffs as sellers would accept for the Property.

31.     Prior to entering into the Listing Agreement, Umansky believed the Property was worth far more than the list price and was an opportunity for a buyer to earn massive profits on a purchase and resale.  He discussed his new listing with his friend and client Mauricio Oberfeld, a real estate developer Umansky had previously

- 7 -
COMPLAINT

worked with who had extensive knowledge about the Malibu real estate market. Oberfeld agreed the listing price was well below market and likely the value of just the land on the Property.  Both agreed that, even if the buyer paid tens of millions of dollars above the list price, he could earn massive profits on a quick resale.

32.     On information and belief, Umansky agreed with Oberfeld, and later Defendants and other buyers as alleged in greater detail below, to use his role as listing agent to depress the price for the Property so that Oberfeld could buy it for far below market, then resell it for a large profit.  In furtherance of that agreement, and before the listing agreement or purchase agreement were signed, Oberfeld agreed to use Umansky to help him find buyers of the Property from him and investors in the acquisition in exchange for compensation, and invited Umansky to invest in the project, thus earning additional secret profits from a depressed price and creating conflicts of interest with Umansky's fiduciary duties to Plaintiffs.

33.     After entering into the Listing Agreement, Umansky approached only his friends and clients as potential buyers and entered into agreements with some or all of them not to bid against each other for the Property.  Umansky also ignored expressions of interest from other non-clients, including Jones Builders Group, Inc., which had contacted DOJ and was then referred to Umansky.  As discussed below, this resulted in offers in a narrow range from only Umansky's clients, except for an offer from one non-client and his agent, Hakim and Segal.

34.     Hakim learned about the Settlement Agreement and its provisions for sale of the Property and hired Segal and BHHC to be his brokers in connection with a potential purchase, as well as a potential resale of the Property for a profit. Knowing the Property was being sold subject to the Settlement Agreement, Segal approached the DOJ on Hakim's behalf to express interest in the Property and was referred to Umansky as listing agent.

35.     On information and belief, before contacting the DOJ, Hakim and Segal reviewed the Settlement Agreement and Order and were familiar with their

requirements, including that the Property be sold for its fair market value.  Segal directed his email to Stephen Welk and Woo Lee, who represented the United States in the Action and the Settlement Agreement and Order.  Their names appeared on the Order and Settlement Agreement along with other DOJ attorneys, but their email addresses were the only ones appearing on those documents.  As a licensed agent and a real estate developer, both Segal and Hakim also were familiar with the provisions of the form Listing Agreement Umansky signed and his fiduciary duties to Plaintiffs as his clients.

36.    On July 27, 2015, after Segal had contacted Umansky to express Hakim's interest in the Property, Umansky told Segal the listing price for the Property was $32 million.  Hakim and Segal were surprised because this was significantly below the actual market value for the Property.   Segal told Umansky that Hakim was prepared to pay significantly more for the Property.  At Umansky's request, Hakim and Segal gave him written offer for the list price for delivery to his clients, with documentation verifying Hakim's ability to pay that amount.

37.    On August 1, 2015, Hakim and Segal met with Umansky at the Property.  During this meeting, Hakim and Segal reiterated their strong desire to purchase the Property and made a verbal offer of $40 million for the Property and told him that they would pay "whatever it takes" to buy the Property.  Realizing that this would result in a bidding war and much higher price for the Property, Umansky told them not to put the higher offer in writing.  He also told them that the DOJ was overseeing the sales process and that he believed the Plaintiffs and DOJ would agree to sell at the list price if no higher offers were submitted.  On information and belief, he also assured them the lower offer would not reduce their chances of being chosen and that he would ensure other offers would not be higher to avoid a bidding war.

38.    Hakim and Segal both knew based on this conversation that Umansky was not trying to obtain the true market price for the Property but instead was violating the Order and his contractual and fiduciary duties to his clients by trying to

COMPLAINT

keep the price as low as possible. They also knew this could be accomplished only if Umansky was having similar discussions with other buyers, including those whom Hakim and Segal knew or believed were represented by Umansky or The Agency. Hakim and Segal agreed with Umansky to not put their offer in writing and instead let him submit their lower offer of $32 million to avoid a bidding war and conceal from Plaintiffs and DOJ that they could sell it for much more.

39.     Umansky also obtained offers from four other prospective buyers, all of whom were also his clients and represented by Umansky's firm, The Agency. On information and belief, while the legally required disclosure on each offer stated that The Agency was the brokerage firm for both the seller and each of those offers identified other agents at The Agency as responsible for advising and representing each buyer, Umansky in fact had prior business relationships with, and was advising, each of them with respect to the purchase.

40.     Among the other offers was one from Oberfeld, who had retained Umansky as his agents on the purchase and any resale, and who also was a close childhood friend of Hakim. The required "disclosure" of this dual agency in Oberfeld's first offer identified another agent at The Agency as working for him. In fact, Umansky secretly advised and acted as Oberfeld's agent on the purchase as well as efforts to find a buyer and investors for Oberfeld for secret compensation while Umansky was purportedly acting as Plaintiffs' agent on the sale, while the other agent identified in this disclosure had minimal involvement.

41.     On information and belief, Umansky told Oberfeld about his conversation with Segal and Hakim and that he would ensure the price was as close to the listing price as possible in order to maximize profits on the resale of the Property, and that he would use his position as agent and fiduciary to Plaintiffs to further this scheme. As a result, Oberfeld offered only $32.5 million. On information and belief, Umansky had similar conversations with other prospective buyers, so that any offers would be within a narrow range of the listing price.

42.     All of the offers were between $32 and $33.5 million, the highest of which came from a developer in London named Nicholas Candy, who also required the most time to close the sale.  Even though Hakim verbally offered over $40 million to Umansky, and said he would pay far higher, the written offer he signed for delivery to Plaintiffs was for only $32 million, as Hakim and Segal agreed with Umansky to offer, knowing that Umansky was violating his contractual and fiduciary duties to Plaintiffs and the Settlement Agreement and Order.

43.     In August 2015, Umansky presented Plaintiffs and the DOJ with these offers.  Despite knowing Hakim and others were willing to pay more, Umansky recommended to DOJ and Plaintiffs that they send the same counter-offer to all of the bidders, at the amount of the highest bid, $33.5 million.  This was in furtherance of his efforts to keep the price as low as possible and agreements with Defendants and others.  Umansky recommended $33.5 million because that was the highest of the offers he had presented to Plaintiffs and therefore he could not credibly propose that they counter with a lower price.  Based on the recommendation of Umansky as their agent and fiduciary, Plaintiffs and DOJ agreed with this proposal.

44.     On or about December 14, 2015, Umansky gave Hakim and Segal a "Multiple Counter-Offer" from Plaintiffs offering to sell the Property to Hakim for $33.5 million.  Hakim and Segal knew, and the counter-offer stated, that Plaintiffs were also making the counter-offer to other prospective buyers, and would have the right to select the buyer even if Hakim accepted the counter-offer without change.  Hakim and Segal also knew it is common in such cases for buyers to offer more than the counter-offer to increase the likelihood of being chosen as buyer.  They also knew that, unless the other bidders had agreed not to increase their offers, there was a risk one or more would do so and be chosen as buyer over Hakim.

45.     Hakim and Segal again advised Umansky verbally that they were willing to pay significantly more for the Property, but Umansky again urged them not to put a higher offer in writing but to simply accept the counter-offer at $33.5

million.  Hakim and Segal again complied with Umansky's request and signed the counter-offer at $33.5 million.  Hakim and Segal agreed to do so despite knowing that Umansky was breaching his duties to Plaintiffs and actively working to keep the price as low as possible to maximize the profits on a resale, and in furtherance of a conspiracy with other prospective buyers to not bid up the purchase price.

46.    Hakim and Segal agreed with Umansky to conceal their higher written offer because they believed that, as a result of Umansky's efforts and communications with all bidders, the Property could be acquired by one of the bidders for far less than its market price, but that, if they raised their bid, Umansky would advise other bidders to match the offer, leading to a bidding war and significantly higher price for whoever was chosen as purchaser.  While there was a risk  another buyer could be selected, Hakim and Segal believed Hakim likely would be chosen if all offers were equal amount because of his financial ability and short time frame to close.  They also believed the possibility of buying the Property for a price tens of millions of dollars below its value outweighed the risk that a price war would make the purchase far less profitable.

47.    Hakim and Segal also believed they would be chosen if all offers were for the agreed below market price, because Segal had advised Umansky that, if Hakim was chosen, Segal would kick back to Umansky half of his share of the buyer's broker's commission.  On November 4, Segal gave Umansky a signed "confidential" addendum to Hakim's offer agreeing in writing to pay half of his commission to Umansky.  Umansky wrote in response: "Received.  You are a man of your word.  I truly hope that you get picked."  Hakim and Segal understood this to mean Umansky would advise Plaintiffs to choose Hakim.

48.    By offering this secret kickback to the seller's agent instead of increasing the price to the seller, Segal and Hakim knew and intended that this would ensure Hakim would be chosen and benefit from the artificially below market

price.  Segal also knew and intended that he would make up for the lower commission with the commission as listing agent on the resale.

49.     On information and belief, Hakim and Segal also believed that, if Hakim was not chosen as buyer, he could invest with the buyer or buy the Property from him and still pay less than they would have paid in a competitive contest to buy from Plaintiffs, thereby sharing in the fruits of the scheme.  In fact, Hakim and Oberfeld were close friends from childhood and, immediately after Oberfeld was chosen as the buyer, Hakim signed a secret Letter of Intent to buy Oberfeld's position as buyer for an additional $8.5 million dollars.

50.     On information and belief, Umansky told Hakim and Segal at the time they agreed to not increase their offer that Oberfeld was seeking investors for a purchase and, if Oberfeld was chosen, they could share in the profits by investing or paying for an assignment from him, and Hakim assured Umansky would do the same for him and Oberfeld if he was picked.

51.     Umansky also delivered to Oberfeld a Multiple Counter-Offer with the same terms as the one for Hakim.  Umansky knew Oberfeld would be willing to pay many millions more for the Property and believed the list price was "land value" and very far below its market value.  On information and belief, despite this, Umansky told Oberfeld he did not need to make a higher offer because Umansky had ensured that the other bidders would not offer higher, and specifically that Hakim had agreed not to offer more money to compete for the Property.

52.     Oberfeld knew and believed that Umansky would ensure he was selected as the buyer without having to compete on price, thereby dramatically increasing his anticipated profits on the transaction because Oberfeld had agreed Umansky would be the listing agent on resale of the Property, which would result in a very lucrative additional commission, and told Umansky he would have the opportunity to invest in the project if Oberfeld was chosen.

53.     The same Multiple Counter-Offer was also delivered to two other prospective buyers, Nicholas Candy in London and Richard Stark in Los Angeles, both of whom were also represented by The Agency and were also clients and friends of Umansky and advised by him in connection with this transaction. Umansky also personally met with Candy in London to discuss his response, after which Candy did not increase his offer.  On information and belief, Umansky also discussed the counter-offer with Stark, who also did not raise his offer.  In other words, after meeting with Umansky, an extremely savvy and skilled agent tasked with getting the highest price for Plaintiffs, and despite each of them knowing and believing the Property was worth far more than $33.5 million, none of the bidders increased their offer.

54.     On information and belief, Umansky also told Candy, Stark, and/or other potential bidders they could invest in the purchase by Oberfeld, thereby earning profits from the resale, and sharing in the increased profits resulting from the depressed purchase price.

55.     Umansky recommended that Plaintiffs and DOJ agree to sell the Property to Oberfeld for $33.5 million, with Hakim as the backup buyer.  Umansky recommended against agreeing to sell to Candy, purportedly because Candy would need to extend the close date until after March 2016.  He did so even though he knew that Oberfeld still needed to find investors in order to be able to close and likely would also need even more time than Candy to complete the sale.  Plaintiffs agreed to the recommendation of their agent and fiduciary.

56.     The sale was subject to approval of the DOJ, as required by the Settlement Agreement and Order, and the approval process included an interview of Oberfeld by FBI agents.  As a result, DOJ did not approve the sale until February 2016.  If DOJ had been made aware of the agreements and higher offers, it would not have approved the sale.  If Plaintiffs had been aware of the agreements and higher offers, they would not have agreed to the sale.

57.     Even though Oberfeld's offer provided that it would be an "as is" cash offer that did not require any third party financing, both Umansky and Oberfeld knew that he did not have the funds to pay the $33.5 million price and was seeking a loan and investors to help him pay, or find another buyer to whom to flip the Property.  In fact, Umansky was already helping Oberfeld find investors for his acquisition and buyers who would pay a significantly higher amount for the Property than Umansky was trying to get for Plaintiffs.

58.     On December 23, 2015, Umansky emailed Oberfeld to tell him he had been chosen as the buyer for $33.5 million.  Oberfeld responded: "Fantastic.  Moe, how did it go w your guy."  Umansky responded: "Very well.  He might take it off our hands.  I pitched it for 42."  Umansky identified this prospective buyer as Livingstone.  In other words, by the time Umansky persuaded Plaintiffs to sell the Property to Oberfeld for $33.5 million, he was already secretly discussing sale to this third party on Oberfeld's behalf for almost $10 million higher.  Umansky did not pitch the Property to Livingstone for $42 million on Plaintiffs' behalf.

59.     On information and belief, Umansky also pitched the Property to other potential buyers from Oberfeld while he purportedly was acting as seller's agent for Plaintiffs, and Oberfeld agreed to compensate Umansky for these efforts, including with commissions.  Umansky's efforts to find buyers for Oberfeld continued after he was chosen as the buyer, including over the several months before the close, when Plaintiffs still owned the Property and Umansky was still acting as their agent with fiduciary and contractual duties to them.

60.     Shortly before the sale to Oberfeld was approved, and even though he was the listing agent who continued to owe fiduciary duties to Plaintiffs until at least the close and knew Oberfeld had not satisfied any contingencies and had not yet raised the funds to complete the sale, Umansky invited Hakim and Segal to invest or purchase Oberfeld's position as buyer, as they had discussed during the period prior to Plaintiffs' agreement to sell to Oberfeld.

61.    Umansky arranged a meeting between Hakim, Segal and Oberfeld in February 2016, at which Oberfeld gave Segal and Hakim a development plan for the Property that Oberfeld and Umansky were using to pitch the Property to investors and buyers, even though Plaintiffs still owned the Property and contingencies had not yet been satisfied.  The plan stated, among other things: "The acquisition price is close to land value and there is a minimal amount of work required to relist this at a price that generates substantial returns.  Product in this class now sells for over 60, even 70 million in Malibu."

62.    On February 10, 2016, Segal, on Hakim's behalf, delivered to Umansky a signed letter of intent from Hakim to pay Oberfeld $8.5 million more than Oberfeld agreed to pay for the Property for a secret assignment of his position as buyer, and pay an 4% commission to Umansky.  Segal emailed the agreement to Umansky, writing: "Sam is very much pleased with the discussions we had and prospect of getting this home for his wife and children.  It is my understanding Mauricio Oberfeld has been a dear friend of Sam's since childhood and with that taken into consideration we present to you the terms included."

63.    Umansky presented the offer to Oberfeld, but not to Plaintiffs, who owned the Property.  Shortly thereafter, Umansky sent Hakim a counter-offer by email dated February 21, 2016, of $15 million on behalf of Oberfeld, with the same 4% commission to him.  Hakim's offer and this counter provided that they would be kept strictly "confidential" and not disclosed to anyone else, including Plaintiffs and DOJ.  In doing so, Hakim and Segal made clear they were knowingly encouraging Umansky to violate the Order and his disclosure duties.

64.    Hakim and Segal continued to discuss the transaction with Umansky and Oberfeld until at least the close and Umansky provided Hakim and Segal information concerning the status of the transaction including information on contingencies, while simultaneously working to assist Oberfeld in finding investors as another alternative to enable him to close.

65.     As real estate agents, brokers and developers, Defendants knew Umansky continued to owe fiduciary duties of honesty and full disclosure, and the duty not to enter into arrangements to obtain secret profits from the transaction, until at least the close.  They also knew that real property transactions like this provided many opportunities for a seller to terminate the sale, including if the buyer failed to pay required deposits or meet deadlines.  Defendants knew that the existence of other buyers or offers would be an important factor in Plaintiffs' decision whether to terminate the sale for such failures and whether to agree to repair credits, extensions and requests to waive contingencies and deposits.

66.     Defendants also knew that Umansky's activities in attempting to negotiate a flip to Hakim and others long before the sale to Oberfeld had closed, and his efforts to depress the price, breached his fiduciary and contractual duties to Plaintiffs, but they continued to actively encourage and assist him in doing so, including by offering him secret compensation.

67.     Based on Oberfeld's promises of compensation and commissions, Umansky agreed at Oberfeld's request to recommend waiver of a required $1 million deposit, claiming Oberfeld "is concerned about having 1 Million dollars tied up indefinitely" and that it would be impossible to find another buyer for the property, when Umansky knew he needed the waiver because he did not have the funds and that other buyers were prepared to take his place for more millions more.

68.     With the deadlines for various contingencies and close rapidly approaching, at Oberfeld's request and in exchange for Oberfeld's agreement to pay him secret commissions and other compensation, Umansky repeatedly urged Plaintiffs to extend the contingency periods and close of escrow so that Oberfeld could continue to find investors.

69.     In April, Umansky was still helping Oberfeld find investors or buyers so he could complete the purchase.  Despite having agreed to buy the property "as is," Oberfeld requested a $1 million credit for repairs.  At Oberfeld's request and in

furtherance of their conspiracy, Umansky pushed Plaintiffs "so hard" to agree to the credit. Plaintiffs reluctantly agreed, benefiting Oberfeld and anyone else with a financial interest in the flip, including Umansky and Hakim if he was able to acquire Oberfeld's position. Oberfeld told Umansky in writing that his ability to complete the purchase depended on the credit because he did not have sufficient funds.

70. Just two weeks before the close of the sale, and after all contingencies had cleared and the deed was signed by Plaintiffs, Umansky wrote the Department of Justice that Oberfeld had just "invited me to invest with him" and "to express my intention of making an investment with Mauricio Oberfeld into the deal." Three days later, Umansky wrote an e-mail to Sweetwater about several topics. Towards the end of the e-mail Umansky wrote, "for the sake of full disclosure . . . Mauricio [Oberfeld] invited me to invest about one month ago after we removed all contingencies [and] I do intend to make an investment with them."

71. This "full disclosure" was anything but. It was too late for Sweetwater to get out of the sale to Oberfeld. It also itself was another fraud, as conspicuously absent was any disclosure of Umansky's other earlier dealings, financial interests, and conflicts outlined above, including long before contingencies were removed. As a result, Plaintiffs did not know or have reason to suspect any agreements existed prior to removal of contingencies, let alone that the Property could have been sold for far more, until at the earliest learning that the Property had been resold for more than double the purchase less than a year after the sale closed.

72. The sale of the Property closed on or about June 30, 2016. On March 30, 2017, less than a year later, Oberfeld flipped the Property to a buyer found by Umansky for $70 million, more than double what they paid, raising doubts that Umansky used required diligence to sell the Property or had been acting against Plaintiffs' interests, Plaintiffs' counsel demanded information from Umansky. In September 2017, Umansky provided documents relating to the sale, revealing some of the facts alleged and specific statements quoted in this complaint.

- 18 -
COMPLAINT

73.     Plaintiffs did not know and had no reason to suspect that they had suffered an injury and that it was the result of wrongdoing until at least some time after March 30 , 2017, when the Property was resold in a private sale just nine months after the initial sale to Oberfeld for more than double the price, press reports were published providing information on the sale that included the purchase price, and Plaintiffs subsequently received documents from Umansky that revealed information suggesting his conflicting interest and arrangements with Oberfeld that had begun long before Umansky had represented they did.

74.     On March 13, 2019, Plaintiffs filed a lawsuit against Umansky and The Agency, entitled *Sweetwater Malibu CA LLC et al. v. Mauricio Umansky, et al.* (Case No. Case No. CV 19-1848-GW-SSx), in which they sought, among other things, disgorgement of any profits earned by Umansky on the resale of the Property, based on various claims including breach of contract and the Order, fraud and breaches of fiduciary duty.  Plaintiffs reached a confidential settlement with Umansky and The Agency, but the action remains pending.

75.     In September 2019, Hakim and Segal filed actions against Umansky and Oberfeld in Los Angeles County Superior Court entitled *Sam Hakim v. Mauricio Umansky, et al.* (L.A.S.C. Case No. 19SMCV01619) ("Hakim Action") and *Aitan Segal v. Mauricio Umansky, et al.* (Case No. 19SMCV01720) ("Segal Action").  Hakim and Segal each specifically alleged that they had told Umansky that they were offering $40 million for the Property and willing to pay "whatever it takes," but instead agreed with Umansky to submit a written offer for only $32 million and not bid higher than $33.5 million in response to Plaintiffs' counter-offer, knowing Umansky was violating his fiduciary and contractual duties to Plaintiffs to maximize the price.

76.     Plaintiffs entered into written tolling agreements with Defendants, effective as of March 20, 2020, that extended the statute of limitations or other

defense based on passage of time by three months, that was subsequently extended an additional three months.

## FIRST CAUSE OF ACTION

### (Conspiracy to Violate the Order)

77.    Plaintiffs hereby incorporate in this cause of action each and every one of the foregoing paragraphs as though fully set forth herein.

78.    The Order required that the Property be sold in accordance with the Settlement Agreement, including its requirement that the Property be sold for its true fair market value.  The Order also imposed obligations on Defendants as listing agents, including obligations to sell the Property for its true fair market value and to work cooperatively with the United States and provide it with relevant information related to the Property and sale.

79.    On information and belief, all Defendants were aware of the provisions of the Order and Settlement Agreement and Order and reviewed them in connection with the transactions alleged above relating to the Property and Plaintiffs.

80.    Defendants knowingly conspired with Umansky to violate the Order by agreeing with Umansky to artificially depress the purchase price for the Property far below its fair market value and divert value to themselves from its designated use under the Order to benefit the people of Equatorial Guinea.  In exchange for Umansky's agreement to violate his duties under the Order, Defendants offered and agreed to pay Umansky secret compensation, including Segal and Hakim agreeing to kick back a portion of Segal's commission and Oberfeld's agreement to compensate Umansky for finding investors and buyers for Oberfeld while he was still listing agent.  Umansky, in conspiracy with Defendants, also knowingly and intentionally violated his specific obligation under the Order as listing agent to work to sell the Property for its fair market value.

81.    In furtherance of their conspiracy, and with Defendants' agreement and assistance, Umansky misrepresented to the DOJ and Plaintiffs that the only offers he

had received were at or less than $33.5 million, when he knew Hakim actually had offered at least $40 million.

82.     In addition to agreeing to pay Umansky secret compensation for his role, Hakim and Segal actively assisted the conspiracy by agreeing with Umansky to put in writing for the DOJ and Plaintiffs a written offer millions of dollars less than their verbal offer to Umansky in order to conceal it from DOJ and Plaintiffs, thereby enabling Oberfeld to acquire the Property for far below market.  After Oberfeld was approved as buyer at the artificially low price agreed to with Hakim and Umansky, and further to their agreement to share in the spoils of their wrongdoing, Hakim and Segal sought to share in the benefits of the low price by offering to buy an assignment of Oberfeld's position as buyer for a price still far below its actual value.

83.     As a legal and proximate result of Defendants' conspiracy with him, Umansky concealed higher offers from DOJ and Plaintiffs and actively worked to ensure the Property was sold for far less than its fair market value, all in violation of the Order, thereby damaging Plaintiffs in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Violation of Section 1 of the Sherman Antitrust Act)

84.     Plaintiffs hereby incorporate in this cause of action each and every one of the foregoing paragraphs as though fully set forth herein.

85.     Defendants participated in a price fixing scheme and conspiracy in restraint of trade to artificially depress the price for the Property, by way of an express or at least implied agreement between Hakim and Segal on the one hand, and other prospective buyers, including Oberfeld, on the other hand, directly and through Umansky, to limit the price to $33.5 million.

86.     The conspiracy involved a transaction in interstate and international commerce, in that the Property was owned by a resident of a foreign country, Nguema, and his single member LLC in California, Sweetwater, the actual and potential buyers of the Property and investors with Oberfeld included residents of

other states and countries.  The Agency refers to itself as a "Global Marketing and Sales Organization" in recognition of the global scope of its business and buyers for the properties it sells for clients.  The sale had to be approved by both Plaintiffs and the DOJ and the proceeds of the sale of the Property were required by the Order to be used to benefit the people of Equatorial Guinea as directed by a committee comprised of a representative of Nguema and a representative of the United States chosen by the DOJ, and the conspiracy was carried out in part by misrepresentations to DOJ representatives in Washington D.C.  For the same reasons, and because the conspiracy prevented other potential buyers from having an opportunity to purchase the Property, the conduct and any effect outside the United States also had a direct, substantial and foreseeable effect on commerce within the United States.

87.     The conspiracy included Umansky, who purportedly represented Plaintiffs in the sale, but, as Defendants knew, in fact was representing his own interests and the interests of other buyers, including at least Oberfeld, as all Defendants knew at the time they reached agreements with Umansky to restrain competition on price amongst bidders for the Property.

88.     In furtherance of that scheme, as discussed above, Hakim and Segal agreed to not put in writing their verbal offer of $40 million for the Property and to instead allow Umansky to present a far lower and below market price of $32 million to Plaintiffs and DOJ, and also to not put in writing their offer of $40 million or more in response to Plaintiffs' counter-offer of $33.5 million, based on Umansky's assurances that he would make sure neither Oberfeld nor any other buyer would pay more so the price would not be bid up higher.

89.     On information and belief, Umansky also used his position as agent for the sellers as well as most buyers, including Oberfeld, to limit their offers for the Property in order to avoid a bidding war that would dramatically increase the price for the Property making a resale far less profitable.  Umansky's firm in fact represented all the other bidders but Hakim.

90.     Hakim and other buyers knew the Property was worth tens of millions of dollars more than the final price and were prepared to pay a dramatically higher price.  Indeed, they had verbally offered Umansky at least $40 million, but then agreed with him not to put it in writing.  Both also believed other bidders for the Property would be willing to pay far higher and that a bidding war would result in a final price that was tens of millions of dollars higher.

91.     Oberfeld and Hakim each would have offered more, resulting in a competitive bidding war and much higher price, unless they received assurances from Umansky that other bidders also had agreed not to offer a higher price.

92.     Hakim and Segal believed Hakim would be chosen as the buyer if all of the bidders offered the same low price, because they had agreed to kick back to Umansky a portion of Segal's commission, thereby giving him an incentive to recommend Hakim's offer.  They also believed that, even if Hakim was not selected, he would have the opportunity to invest or buy the Property from the buyer at a price that still would be less than in a bidding war.

93.     As result, even though Plaintiffs had hired Umansky and agreed to pay him a higher than market commission because of his reputation and skill in finding buyers and getting high prices for very high end estates such as this, and even though both Hakim and Segal knew the listing price was far below market and were willing to and told Umansky they would pay tens of millions of dollars more for the Property, they did not compete on price and all ended up with the same final offer of $33.5 million, despite knowing there were other bidders.

94.     By not offering more for the Property, Hakim, Segal and Oberfeld acted contrary to their independent economic interests absent an express or tacit agreement not to compete on price to avoid bidding up the final price.  Because each of them believed the list price was far below its value and tens of millions of dollars in profits could be earned on the resale, they each would have had an incentive to

- 23 -

COMPLAINT

bid higher to maximize their chance of making those profits, unless they had assurances that no other buyer would bid more for the Property unless they did.

95. As all Defendants knew, by seeking Hakim's agreement not to put in writing his higher offer and advising Oberfeld not to increase his offer, Umansky also was acting contrary to his economic interests would be in a competitive bidding contest, because a higher price would have paid a higher commission to Umansky. It would only be in his economic interest if he had agreements that would compensate him for achieving a lower price. In fact, as alleged above, each of the Defendants agreed to compensate Umansky if Hakim were the chosen buyer and he succeeded in depressing the price below market.

96. As a legal and proximate result of Defendants' conspiracy with Umansky to violate section 1 of the Sherman Act, Plaintiffs suffered injury consisting of a lower price for the Property in an amount to be proven at trial, in excess of $10 million. Plaintiffs also are entitled to treble damages and attorneys' fees as provided by the Clayton Act.

## THIRD CAUSE OF ACTION

### (Violation of California Cartwright Act, Cal. Bus & Prof. Code § 16720)

97. Plaintiff hereby incorporates in this cause of action each and every one of the foregoing paragraphs as though fully set forth herein.

98. As alleged above, Defendants participated in a conspiracy and combination in restraint of trade, by agreeing expressly or implicitly to not compete on price for the Property in order to artificially reduce the price for the Property.

99. As a legal and proximate result of Defendants' conspiracy with Umansky and others to violate the Cartwrights Act, Plaintiffs suffered injury consisting of a lower price for the Property in an amount to be proven at trial, but no less than $10 million. Plaintiffs also are entitled to penalties, disgorgement and attorneys' fees as provided by statute.

## FOURTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duties)

100.   Plaintiff hereby incorporates in this cause of action each and every one of the foregoing paragraphs as though fully set forth herein.

101.   As licensed real estate agents and brokers, Umansky and The Agency owed Plaintiffs fiduciary duties, including duties of the utmost care, integrity and honesty, a duty to diligently work to maximize the price for the Property, and a duty not to enter into agreements to earn secret compensation or create conflicts interests that conflicted with his duties to Plaintiffs as sellers and their clients.

102.   While California allows a broker to represent both the buyer and seller in the same transaction, with full disclosure of the arrangement and informed consent, the agent continues to owe fiduciary duties to both clients, limited only by the proviso that it may not disclose to either client that the other is willing to pay (or accept) a higher (or lower) price for the property.

103.   Among the duties owed by real estate brokers is a duty not to receive any secret profits arising from the representation without full disclosure of details of the arrangement and informed consent of the client.  A broker or agent who receives secret profits also must disgorge them to his client, whether or not the client would have received a better price absent them.

104.   Umansky's duties to Plaintiffs did not end with the signing of a purchase agreement, but continued until at least the close, especially because Defendants successfully pressured Plaintiffs to (ii) waive the requirement that Oberfeld pay a deposit of $1 million, (ii) extend deadlines for physical inspection contingencies and close of escrow instead of exercising its right to terminate the sale to Oberfeld due to his breaches and failure to satisfy conditions, and (iii) agree to a $1 million credit for repairs.  Absent those agreements, waivers and extensions, Oberfeld could not have completed the sale, entitling Plaintiffs to terminate.

105.    Umansky and The Agency breached their fiduciary duties to Plaintiffs and conspired with each other and with third parties to breach their fiduciary duties, as alleged above, including failing to work diligently to maximize the price, instead intentionally working with the prospective buyers to minimize the sale price through unlawful agreements, and entering into to agreements with prospective buyers to earn compensation in exchange for those efforts.

106.    Defendants, as licensed brokers and agents, and real estate developers, were fully aware of the fiduciary and other duties Umansky and The Agency owed to Plaintiffs.

107.    Defendants were aware of Umansky's and The Agency's breaches of fiduciary duty as outlined above.  Defendants knew Umansky was working to minimize the price for the Property and entering into agreements with them and Oberfeld to earn secret profits that created conflicts of interest.

108.    Defendants provided both substantial assistance and encouragement to Umansky's breaches of fiduciary duties, as outlined above, including by entering into secret agreements with Umansky to provide compensation in exchange for his efforts to depress the price for the Property, and agreeing with other buyers through Umansky not to compete on price.

109.    If Defendants had not breached their fiduciary duties, Plaintiffs would not have agreed to sell to Oberfeld or would have terminated the sale due to his failure to pay the required deposit, failure to close by the required date, or failure to waive the physical inspection contingency, and would have sold the property to another buyer for millions or tens of millions of dollars more.

110.    As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, but in excess of $10 million.  Plaintiffs also are entitled to disgorgement of all profits obtained by Defendants as a result of their breaches and wrongdoing alleged herein, and a constructive trust over such profits.

111.    Defendants acted with fraud malice and oppression, entitling Sweetwater to recover punitive or exemplary damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Fraud and Conspiracy to Commit Fraud)

112.    Plaintiff hereby incorporates in this cause of action each and every one of the foregoing paragraphs as though fully set forth herein.

113.    Defendants entered into a conspiracy with each other, Umansky and others as alleged herein to defraud Plaintiffs into selling the Property for tens of millions of dollars below its actual market value, so as to maximize the profits to the buyer on resale of the Property.

114.    In furtherance of conspiracy, and as alleged in greater detail below, Defendants entered into financial arrangements with Umansky that would pay him secret compensation and profits, in exchange for his efforts described below to defraud Plaintiffs of the Property or its full market value.

115.    In furtherance of the conspiracy, Hakim and Segal submitted a written offer for Umansky to deliver to Plaintiffs on or about July 27, 2015, for $32 million, that misrepresented and helped him conceal their actual verbal offer to Plaintiffs' agent Umansky of $40 million or more.  Hakim and Segal agreed to his request not to put it in writing and instead write an offer for $32 million to support his concealment of the higher offer from Plaintiffs.

116.    Hakim and Segal also offered Umansky secret compensation for his role in concealing and misrepresenting material facts including the existence of higher offers and the fact that he was actively working to depress the price for the Property below market.  For example, on November 4, 2015, Segal agreed to pay Umansky half of Segal's commission on a purchase of the Property by Hakim in exchange for his help defrauding Plaintiffs.

117. On February 20, 215, Segal and Hakim offered Umansky a commission on a proposed purchase of the Property from Oberfeld, who did not yet own the Property, in exchange for presenting it to Oberfeld and concealing it from Plaintiffs so they would not discover that they could sell the Property for a much higher price. The offer specifically provided that it was to "be kept strictly confidential by both [Hakim] and [Oberfeld]," and therefore required Umansky to keep it secret from Plaintiffs as his clients and fiduciaries, and from DOJ.

118. In furtherance of the conspiracy, Umansky made material misrepresentations to Plaintiffs and the DOJ in the course of the sale of the Property, failed to disclose agreements with Oberfeld and others providing for secret profits and commissions in addition to commissions paid by Sweetwater under the listing agreement, as well as other material facts, and breached duties of care, integrity, honesty and loyalty to Plaintiffs.

119. As alleged in greater detail below, Umansky knowingly misrepresented to Plaintiffs material facts, including (i) that the offer from Oberfeld was "all cash" not contingent on any third party financing, (ii) that Umansky was using his best efforts and due diligence to sell the property for Plaintiffs and would disclose to them all offers received for the Property, (iii) that Oberfeld was able to close the sale within 60 days, (iv) that Plaintiffs would be unable to find another buyer at the same price or more if they did not waive the deposit and extend escrow, (v) that Umansky was first invited to invest in the Property only after all contingencies were satisfied, and (vi) that Oberfeld's offer was the highest Umansky had received.

120. As alleged in greater detail below, Umansky also failed to disclose material facts he had duty to disclose, including the (i) the existence of offers for the property significantly higher than the offer from Oberfeld that they advised Plaintiffs to accept, (ii) that Oberfeld was unable to close the purchase if he was unable to not find investors and other third party financing, (iii) that Umansky had been offered additional consideration by Oberfeld and other offerors, and (iv) the

- 28 -

nature and existence of arrangements with Oberfeld, Hakim and Segal that would give him secret profits or consideration beyond his disclosed commission.

121.    For example, in the Listing Agreement Umansky signed with Plaintiffs on or about June 16, 2015, he represented that he would use "reasonable effort and due diligence" to sell the Property and disclose all offers.  In order to induce Plaintiffs and DOJ to approve him as Listing Agent, Umansky emailed marketing materials highlighting his "notable sales" to Stephen Gibbons of DOJ on March 24, 2015, and touted his skill and results to Plaintiffs in meetings with Plaintiffs' representatives, including Nguema and Matias Mba Medja in early June in Geneva, Switzerland.  Before the Listing Agreement could take effect, it also had to be approved by DOJ and was further modified at DOJ's request.  To induce DOJ to approve him, Umansky further described his skills and qualifications in a telephone call with Gibbons on or about May 22, 2015.

122.    On August 16, 2015, Umansky provided Plaintiffs with a written list of all offers he claimed to have received for the Property, but omitted higher offers, including one for $40 million from Hakim.  The list falsely represented that the offer from Oberfeld was "all cash" and he could close within 45 days, and Hakim had offered only $32 million rather than $40 million.  Umansky also represented that the offer from Hakim was $32 million in an email to Plaintiffs on July 31, 2015.  On November 2, 2015, Umansky sent an email to Nguema falsely stating we "have been very diligent in trying to get the deal done with Candy [another buyer]" when the truth was he was not working to get a deal done with Candy, but with Oberfeld. The written offer from Oberfeld that was signed and presented to Nguema and his agents by Umansky in August 2015, stated that his offer was "all cash" and no third party funding was needed, and that Oberfeld would be able to close within 45 days. Umansky knew these statements were false but did not disclose those facts to Plaintiffs when he presented the offer or at any time between that date and when Plaintiffs accepted Oberfeld's offer as amended.

- 29 -
COMPLAINT

123.    Despite having received other offers as high as $45 million that he did not disclose, Umansky recommended by email to Nguema on October 1, 2015 that Plaintiffs counter to all of the offers at the same $33.5 million price.  Umansky did so to keep the price as low as possible for himself and his co-conspirator Oberfeld. At Umansky's recommendation, and in reliance on the above representations and non-disclosures, Plaintiffs agreed to sell the Property to Oberfeld in December 2015, pursuant to the offers and counter-offers for $33.5 million.

124.    On March 20, 2016, Umansky verbally advised Plaintiffs' agent Michael Berger that he recommended agreeing to waive a $1 million the deposit Oberfeld did not want his money tied up indefinitely, without disclosing that he did not have funds available and the other better offers he received.  Umansky also recommended that Plaintiffs agree to extend the contingency period because he believed Oberfeld was the "right buyer" for the Property, without disclosing better offers and that Hakim had provided written proof of available funds to close at a much higher price.  On March 20, 2016, Berger sent an email to Nguema describing this conversation and Umansky's recommendation that Plaintiffs waive the deposit and sign an extension of the escrow period, which Plaintiffs accepted.  On March 20, 2016, Umansky emailed Berger to urge him to get the paperwork signed because "the economy is changing and the market is softening so again I repeat time is of the essence."   If Plaintiffs and DOJ had not agreed to the extension, the contingency period would have expired the next day, and Plaintiffs could have sold the Property to another buyer for millions or tens of millions of dollars more.

125.    On April 15, 2016, Umansky sent an email to Nguema and Berger stating that Oberfeld had requested a $1 million credit for repairs, and "my suggestion is to move forward with the credit to the buyer and get this transaction closed before summer season kicks off here."  On April 23, 2016, Umansky sent an email to Stephen Gibbons of the DOJ about the repaid credit and stating that he was "pushing Nguema so hard" and the "property is getting vandalized."  On May 5,

2016, Umansky sent an email to Berger and another agent of Plaintiffs forwarding an e-mail of the same date from Oberfeld asking about the status of the repair credit request.  The e-mail from Umansky stated: "October is getting close.  Let's please close this deal."  At no time did Umansky advise Plaintiffs that, if they did not agree to the repair credit, Oberfeld could not close the sale and they could sell it for a significantly higher price.

126.    On June 13, 2016, Umansky sent an email to Gibbons of DOJ stating: "I wanted to express my intention of making an investment into the deal."  Umansky also wrote that this would clarify "any potential conflict of interest," and was "just for full disclosure."  On June 16, Umansky emailed Berger addressing several topics then stating at the end "for the sake of full disclosure": "[Oberfeld] invited me to invest about one month ago after we removed all contingencies.  I do intend to make an investment with him."  These statements were false and misleading, because Oberfeld in fact had invited Umansky to invest much earlier, and they did not disclose all conflicts of interest, because the omitted the other conflicts described above, including the fact that Oberfeld was simultaneously looking for a buyer for Oberfeld at significantly higher prices, while he was supposed to be working to get the highest price for Plaintiffs.  The June 13 email to Gibbons also falsely stated that "Nguema picked the order of which I was to accept the offers," when in fact Umansky had selected the order and chose Oberfeld.

127.    As Plaintiffs' agent, and as Defendants know, Umansky had a duty to disclose all material facts affecting the purchase and Property, including all offers he received.  In furtherance of the conspiracy with Defendants and with their active assistance, Umansky intentionally concealed Hakim's higher offer from Plaintiffs.  Umansky also had a duty to disclose all financial arrangements including offers of compensation other than his commission from Plaintiffs, but failed to disclose them and instead misrepresented the existence and timing of his financial arrangements

by stating that they consisted only of an offer to invest he claimed was made in May 2015, after contingencies had cleared and the sale was about to close.

128.   As alleged above, Defendants and Umansky knew the falsity of these misrepresentations and non-disclosures and made or conspired to make them with the intent to induce Plaintiffs to sell the Property at a price far below other offers and its market value.

129.   Plaintiffs were unaware of the falsity of these representations or of the facts that were not disclosed and relied on such representations and non-disclosures in agreeing to sell the Property for $33.5 million and agreeing to reduce it by a $1 million repair credit.

130.   If Defendants had disclosed these offers and facts, Plaintiffs would not have entered into the purchase agreement with Oberfeld or would have terminated the purchase due to his failure to pay the agreed deposit, failure to close by the agreed date, or failure to timely satisfy the inspection contingency, and would have sold the Property to another buyer for millions of dollars more than Oberfeld. Alternatively, if Oberfeld timely cured those breaches, Plaintiffs would not have agreed to the demand for a $1 million repaid credit.

131.   As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged herein.  Plaintiffs also are entitled to disgorgement of all secret profits obtained by Defendants and their co-conspirators as a result of their breaches and wrongdoing alleged herein, and a constructive trust over such profits.

132.   Defendants acted with fraud malice and oppression, entitling Plaintiffs to recover punitive or exemplary damage in an amount to be determined at trial.

133.   As a proximate and legal result, Plaintiffs have been damaged in an amount to be proven at trial, and deprived of material consideration, rights and benefits under the Listing Agreement, Settlement Agreement and Order as alleged

1  herein.  Plaintiffs also are entitled to disgorgement of all secret profits earned as a

2  result of their breaches and wrongdoing alleged herein.

3  ## FOURTH CAUSE OF ACTION

4  ### (Breach of Duties of Honesty and Fairness)

5  134.    Plaintiff hereby incorporates in this cause of action each and every one

6  of the foregoing paragraphs as though fully set forth herein.

7  135.    As real estate agents and brokers, Hakim and BHHC owed a duty of

8  honesty and fairness to all parties to the transaction, including Plaintiffs.

9  136.    Dedendants breached that duty by actively and knowingly assisting

10  Umansky and The Agency in their breaches of fiduciary duty and fraud alleged

11  above, agreeing to pay secret compensation to Umansky in exchange for his efforts

12  to depress the price for the Property, agreeing with other buyers directly and through

13  Umansky not to compete on price, and giving Umansky for delivery to Plaintiffs a

14  signed written offer millions of dollars lower than the offer they actually had made

15  to Plaintiffs' agent for the purpose of concealing their higher offer.

16  137.    If Defendants had not breached their fiduciary duties, Plaintiffs would

17  not have agreed to sell the Property to Oberfeld or would have terminated the sale

18  due to Oberfeld's failure to pay the required deposit, failure to close by the required

19  date, or failure to waive the physical inspection contingency, and would have sold

20  the property to another buyer for millions or tens of millions of dollars more.

21  138.    As a proximate and legal result, Plaintiffs have been damaged in an

22  amount to be proven at trial, but in excess of $10 million.  Plaintiffs also are entitled

23  to disgorgement of all secret profits resulting from their breaches and wrongdoing

24  alleged herein, and a constructive trust over such profits.

25  139.    Defendants acted with fraud malice and oppression, entitling

26  Sweetwater to recover punitive or exemplary damages in an amount to be

27  determined at trial.

28

## PRAYER FOR RELIEF

Plaintiffs Sweetwater Malibu CA, LLC and Teodoro Nguema Obiang Mangue pray for the following relief:

1.  For damages in an amount to be proven at trial;

2.  For treble damages for violation of the Sherman Act;

3.  For disgorgement of profits and a constructive trust over such profits;

4.  For prejudgment interest according to proof;

5.  For punitive or exemplary damages according to proof;

6.  For costs of suit; and

7.  For such other relief as is deemed appropriate at trial.

DATED:  September 29, 2020                **CYPRESS LLP**


By:  _/s/ Julian Brew_
Julian Brew
Attorneys for Plaintiffs
SWEETWATER MALIBU CA, LLC and
TEODORO NGUEMA OBIANG
MANGUE

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs Sweetwater Malibu CA, LLC and Teodoro Nguema Obiang Mangue hereby demand a trial by jury on all claims herein.

DATED:  September 29, 2020                **CYPRESS LLP**


By:  *<u>/s/ Julian Brew</u>*
　　　Julian Brew
　　　Attorneys for Plaintiffs
　　　SWEETWATER MALIBU CA, LLC and
　　　TEODORO NGUEMA OBIANG
　　　MANGUE

**COMPLAINT**